IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>CLYDE J. RAINEY,</td><td>No. C 07-00678 CW</td></tr>
<tr><td>Plaintiff,</td><td>ORDER DENYING<br>PETITION FOR WRIT OF<br>HABEAS CORPUS</td></tr>
<tr><td>v.</td><td></td></tr>
<tr><td>MIKE KNOWLES, Warden,</td><td></td></tr>
<tr><td>Defendant.</td><td></td></tr>
</table>

_____/

Petitioner Clyde J. Rainey, a state prisoner incarcerated at Kern Valley State Prison, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent Mike Knowles opposes the petition.  Having considered all of the papers filed by the parties, the Court DENIES the petition.

BACKGROUND

I. Procedural History

On May 7, 1998, the district attorney filed an information in Contra County superior court charging Petitioner with the murder of twenty-year old Koupou Saechao.  The information alleged that Petitioner personally used a firearm and committed the murder while he was engaged in or was an accomplice in the commission or attempted commission of robbery.  On May 4, 1999, after a seven day trial, a jury found Petitioner guilty of first degree murder and found the enhancement allegations to be true.  On August 13, 1999, the trial court sentenced Petitioner to a term of life without possibility of parole, plus four years.  On February 7, 2001, the California court of appeal, in an unpublished opinion, affirmed the

judgment.  On May 16, 2001, the California Supreme Court denied without comment a petition for review.  In March, 2001, Petitioner sought a writ of habeas corpus in the Contra Costa County superior court.  On March 28, 2005, the superior court, in a written opinion, denied the petition.  The California appellate court and California Supreme Court denied the petition without comment.

On February 1, 2007, Petitioner filed his federal petition for writ of habeas corpus, making the following claims: (1) the trial court's failure to order a competency evaluation violated his right to due process under the Fourteenth Amendment; (2) the admission of his confession violated his right to due process under the Fourteenth Amendment; (3) the failure to suppress his confession violated <u>Miranda v. Arizona</u> because his waiver was not voluntary or knowing and intelligent; (4) the admission of the video tape of his conversation with his mother violated his right to privacy under the Fourth Amendment;[1] and (5) the suppression of exculpatory evidence violated <u>Brady v. Maryland</u>.

II. Factual History

The following facts were found by the California court of appeal.  On October 31, 1996, twenty-year old Koupou Saechao was shot twice in the back in front of his aunt's apartment building in North Richmond.  Saechao came to the door to his aunt's apartment, collapsed in her arms and said a "black guy" shot him.  He died

_____

[1]Citing <u>Stone v. Powell</u>, 428 U.S. 465 (1976), Respondent argues that this claim is not cognizable on federal habeas review. <u>Stone</u> held that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, it is not cognizable on habeas review.  <u>Id.</u> at 494.  Petitioner does not respond to this argument in his traverse.  Therefore, the Court concludes he has conceded it and does not address it further.

1  four days later.  On November 6, 1996, the police arrested

2  Petitioner, who is African American and was sixteen years old.

3  Petitioner first denied any involvement in the shooting, then said

4  that he and fourteen-year old Donald C. tried to rob Saechao and

5  that Donald shot Saechao when they found he had nothing for them to

6  steal.  After talking with his mother at the police station,

7  Petitioner confessed to the police that he shot Saechao.

8      When being questioned by the police, Petitioner denied being a

9  member of a gang or participating in the shooting as a gang

10  initiation.  At trial, Petitioner's defense was that he was only

11  guilty of manslaughter because he shot Saechao as part of a gang

12  initiation, not a robbery, and he suffers from developmental

13  limitations that impede his ability to premeditate.

14                          LEGAL STANDARD

15      A federal court may entertain a habeas petition from a state

16  prisoner "only on the ground that he is in custody in violation of

17  the Constitution or laws or treaties of the United States."  28

18  U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death

19  Penalty Act (AEDPA), a district court may not grant a petition

20  challenging a state conviction or sentence on the basis of a claim

21  that was reviewed on the merits in state court unless the state

22  court's adjudication of the claim: "(1) resulted in a decision that

23  was contrary to, or involved an unreasonable application of,

24  clearly established federal law, as determined by the Supreme Court

25  of the United States; or (2) resulted in a decision that was based

26  on an unreasonable determination of the facts in light of the

27  evidence presented in the State court proceeding."  28 U.S.C.

28  § 2254(d).  A decision is contrary to clearly established federal

                                  3

law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result.  <u>Clark v. Murphy</u>, 331 F.3d 1062, 1067 (9th Cir. 2003).

An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to the petitioner's claim, that was properly presented and made part of the state court record.  <u>Taylor v. Maddox</u>, 366 F.3d 992, 1005 (9th Cir. 2004).

Even if the state court's ruling is contrary to or an unreasonable application of Supreme Court precedent, that error justifies habeas relief only if the error resulted in "actual prejudice."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  In other words, habeas relief may be granted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Id.</u> at 638.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as of the time of the relevant state court decision.  <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).

To determine whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established law, a federal court looks to the decision of the highest state court that addressed the merits of a petitioner's claim in a reasoned decision.  <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  If the state court only considered state law, the

United States District Court
For the Northern District of California

4

United States District Court
For the Northern District of California

federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. Lockhart v. Terhune, 250 F.3d 1223, 1230 (9th Cir. 2001).

DISCUSSION

I. Competency Claim

Petitioner argues that the trial court violated his due process rights by failing to order a competency hearing because there was substantial evidence that he was not competent to stand trial.

A. State Appellate Court Opinion

The state appellate court relied upon California law which provides that a mentally incompetent person cannot be tried and defines mental incompetence as the inability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. See California Penal Code § 1367(a); People v. Hayes, 21 Cal. 4th 1211, 1281 (1999). Under California law, when a trial court becomes aware of substantial evidence which generates a doubt about whether the defendant is competent to stand trial, the court must, on its own motion, declare the doubt and suspend proceedings to hold a competency hearing. See People v. Castro, 78 Cal. App. 4th 1402, 1415 (2000).

The state court analyzed Petitioner's claim as follows:

At trial, defense counsel never claimed that appellant was incompetent. Appellant argues on appeal that trial evidence of his developmental limitations, which was offered to refute allegations of premeditation, necessitated a competency hearing. Appellant goes so far as to argue that evidence of a developmental disability, standing alone, constitutes substantial evidence of incompetency to stand trial. Appellant offers his poor academic performance and low IQ test score of 75 as

5

substantial evidence of incompetency.  But evidence of possible developmental disability is not necessarily evidence of incompetency.  The relevant question is whether "as a result of . . . developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a)).

Nothing in the record suggests the appellant was unable to understand the nature of the proceedings or to assist counsel.  Appellant's police station meeting with his mother demonstrates the contrary.  Appellant spontaneously told his mother that he was going to go to prison because he shot a man, and that he would "probably do 25 years."  Appellant explained to his mother that he lied to the police in telling them that 'his partner' was the gunman, and tried to pass a lie detector test by being "cool and calm" and putting the shooting out of his mind.  Appellant formulated a defense in speaking to his mother.  Appellant said: "I'm going to say I'm handicapped when I go to court and stuff.  I'm going to tell my lawyer I'm handicapped."

. . .

[N]othing triggered the need for a competency hearing. Defense counsel never expressed a doubt as to appellant's competence, and nothing in appellant's speech or behavior suggested that he was incompetent.  Indeed, as described above, appellant's pretrial statements show an understanding of the proceedings and an ability to assist in his defense.  Nor did the medical testimony suggest that appellant did not understand the proceedings or could not assist in his defense.  While a clinical neuropsychologist testified that appellant has low intelligence, she also testified that appellant is not mentally retarded, "can think," "can get through life," knows right from wrong, and can work and live on his own. The trial court was not required to initiate competency proceedings.

Pet.'s Ex. A, People v. Rainey, A088153 (2001) at 3-4.

B. Applicable Federal Law

A criminal defendant may not be tried unless he is competent.

Godinez v. Moran, 509 U.S. 389, 396 (1993).  The conviction of a

defendant while legally incompetent violates due process.

Cacoperdo v. Demosthenes, 37 F.3d 504, 510 (9th Cir. 1994).  The

test for competence to stand trial is whether the defendant "has

sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960).

Due process requires a trial court to order a competency hearing if the court has a good faith doubt concerning the defendant's competence. Cacoperdo, 37 F.3d at 510. A good faith doubt about a defendant's competence arises only if there is substantial evidence of incompetence. Id. This standard is "clearly established Federal law, as determined by the Supreme Court" within the meaning of 28 U.S.C. § 2254(d)(1). Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000) (citing Pate v. Robinson, 383 U.S. 375, 385 (1966)).

The state law applied by the court of appeal is not inconsistent with federal law.

C. Analysis

Petitioner argues that the appellate court's decision was an unreasonable application of established federal authority and was based on an unreasonable determination of the facts because the record contains substantial evidence of his incompetency. Petitioner relies on the trial testimony of Dr. Nell Riley, a neuropsychologist who performed a neuropsychological assessment of Petitioner in 1998, when he was eighteen years old. Dr. Riley concluded that Petitioner suffered from very significant neuropsychological impairments based on the fact that his IQ was 75, he was reading at the level of an average six-year old child, had the vocabulary and math skills of a nine-year old child, and had problems processing information. Reporter's Transcript (RT) at

United States District Court
For the Northern District of California

668-70.  Dr. Riley testified that a brain scan showed that an area of Petitioner's brain was not functioning normally and that these impairments may have been caused by complications at birth.  RT at 687-88.  However, Dr. Riley also testified that the tests showed that Petitioner could think, knew right from wrong, could work and live on his own.  RT at 690-91.  She also testified that Petitioner's visual memory was above average, his delayed memory, the ability to keep the information in his brain over time, was good, RT at 700, and he had the ability to understand that certain actions have reactions, RT at 723-24.

There was no evidence at trial that Petitioner could not understand or assist in his defense.  In fact, as noted by the appellate court, there was evidence to the contrary in Petitioner's conversation with his mother and in Dr. Riley's testimony.

Therefore, the appellate court's decision was not an unreasonable application of Supreme Court authority or an unreasonable determination of the facts in light of the evidence in the record.  Habeas relief is denied on this claim.

II. Claims Regarding Admission of Confession

Petitioner asserts that the admission of his confession at trial violated his Fifth Amendment right to remain silent because his <u>Miranda</u> waiver was ineffective and violated his Due Process right to a fair trial because his confession was not voluntary.

A. State Appellate Court Opinion

The relevant portions of the state appellate court opinion are as follows:

> In a pretrial motion, appellant claimed that his waiver of the right to remain silent was ineffective and that his confession was coerced.  The trial court denied the

motion after reviewing the videotaped police interview, a psychological evaluation of appellant, and police testimony.  Appellant renews his challenge to the confession on appeal.

1. The interrogation and confession.

Evidence at the suppression hearing established that appellant was arrested at his home at 7 a.m. on November 6, 1996, after his friend Donald identified him to police as the gunman.  The police interview began at 10 a.m., after the police conducted a probation search of appellant's home and transported him to a police facility with videotape capabilities.  The police did not ask appellant any questions about the shooting while in transport.  At the police station, appellant was placed in a small interview room with a table and three chairs. On videotape, Sergeant Celestre asked appellant if he had been arrested before and advised him of his rights. Appellant said he had been advised of his rights "[p]robably twice" on earlier occasions.  The officer stated and explained appellant's <u>Miranda</u> rights, and appellant said "I understand."  In response to the officer's question if appellant wanted to talk about the allegations against him, appellant said "yeah," and "I'll talk."

Sergeant Celestre, sometimes joined by Sergeant Daley, interviewed appellant.  Appellant sat at the table in a relaxed pose.  Sergeant Celestre told appellant that someone identified him as the person responsible for the killing of an Asian man during an attempted robbery. Initially, appellant denied any involvement in the shooting.  Sometime before 11 a.m., the officer asked appellant if he wanted to take a lie detector test and appellant said yes.  Appellant asked if he could first have something to eat, and the police gave appellant lunch.  As appellant waited alone for lunch, he sang rap songs.

At about 11 a.m., following lunch, appellant took a polygraph test at the District Attorney's office. Investigator Sjostrand explained the test to appellant and interviewed him before examining appellant with the polygraph.  The investigator reviewed the test results and, with Sergeant Celestre present, told appellant that it was clear that appellant shot Saechao.  Sergeant Celestre told appellant that appellant failed the test "all across the board" and said that he had someone willing to testify that appellant shot Saechao. Appellant changed his story, and said that he was involved in an attempted robbery and shooting but that Donald was the gunman.

The officer and appellant returned to the police station

United States District Court
For the Northern District of California

around 2:45 p.m.   Appellant continued to deny being the gunman.   Sergeant Celestre took a break around 3:30 p.m. and Sergeant Daley continued the interview.   Appellant's mother had telephoned Sergeant Celestre, and the officer returned her call.   Sergeant Celestre told her that appellant was going to be booked and asked her if she wanted to see her son.   Appellant's mother said yes.   The police moved appellant to a larger interview room furnished with a sofa and chairs at 4:10 p.m. Appellant's mother arrived at police headquarters around 4:50 p.m. and was taken to appellant.

The police surreptitiously videotaped and monitored appellant's meeting with his mother.   Almost immediately after his mother entered the room, appellant confessed to her that he shot Saechao.   His mother asked appellant: "Are you sure you did it?   Don't be lying for nobody. Don't be trying to lie for nobody."   Appellant replied: "I did it."   Appellant explained to his mother that he lied to the police in telling them that "his partner" was the gunman, and tried to pass the lie detector test by being "cool and calm" and putting the shooting out of his mind.   Appellant told her that he was "going to say I'm handicapped when I go to court and stuff.   I'm going to tell my lawyer I'm handicapped."

Sergeants Celestre and Daley entered the room.   Sergeant Celestre did not tell appellant that the police had been listening to appellant's conversation with his mother. Without referring to the surreptitiously recorded confession, the officer asked appellant: "Clyde, is there anything different you want to tell me now?"   Appellant said "I did it."   Appellant confessed to the police officers that he shot Saechao during an attempted robbery.   Appellant explained that everything he had described earlier about the robbery was true but that he, not Donald, "pulled the trigger."

2. Appellant knowingly waived his <u>Miranda</u> rights.

. . .

Appellant knowingly waived his constitutional rights, judged under the totality of the circumstances.   Sergeant Celestre explained appellant's rights one-by-one, each time eliciting appellant's unhesitant statement that he understood what he was told.   The officer then asked appellant if he wanted to talk and appellant said "yeah" and "I'll talk."   Appellant had experience with the police.   He had been arrested at least twice earlier and advised of his rights on those occasions.   Nothing in the record, either at the time of the waiver or at other points in the interrogation, suggests that appellant did not understand the nature of the rights he waived and the consequences of his waiver.

United States District Court
For the Northern District of California

3.  Appellant's confession was not coerced.

. . .

We agree with the trial court that appellant's confession was voluntary.  The videotapes of the interrogation show no signs of police aggression in conduct or voice.  Sergeant Celestre sat at the interview room table with a coffee mug and a pad of paper on which he wrote notes.  The officer asked a question, waited for appellant's response, then asked another question.  Appellant showed no signs of fear, confusion or fatigue.  Appellant sat calmly in his chair, sometimes leaning back and sometimes listening to questions with has hand propped under his chin.  At one point, when alone in the room, appellant sang rap songs.  Late in the day, Sergeant Celestre asked appellant "Have I treated you right?  Have I shown you respect?," and appellant said yes.  Appellant later told Sergeant Daly: "You all are cool."

Appellant's will was not overborne.  Appellant long denied participation in the shooting, and admitted limited complicity only after failing the polygraph test in an apparent effort to better fit his story to the test results.  Appellant even bragged to his mother that he had lied to the police, but that he wanted to tell her the truth.  After telling his mother that he shot Saechao, appellant confessed to the police without the police ever mentioning their surveillance of the meeting.  Appellant claims that the police coercively used the polygraph test and the meeting with this mother to induce a confession, and that the police lied and falsely promised leniency.

A polygraph test is not inherently coercive, as appellant concedes.  (People v. Brown (1981) 199 Cal. App. 3d 116, 127.)  Nor was its use here coercive.  Appellant willingly agreed to take the test, and it was conducted in a professional manner over a reasonable length of time.  Appellant's chief complaint seems to be Investigator Sjostrand's statement to appellant that a polygraph machine can detect a lie, and did detect lies in appellant's denial of involvement in the shooting.  A polygraph examiner's stated opinion that the test revealed that the suspect lied is not necessarily coercive.  (See Id. at p. 127.)  No coercive effect upon appellant is apparent.  The polygraph test and the examiner's statements did not produce an immediate confession.  Appellant changed his story to admit being present at the shooting, but he continued to deny being the gunman until a couple hours later, after speaking with his mother.  Appellant denied the accuracy of the polygraph test results, telling the examiner and Sergeant Celestre that the results were skewed by his nervousness.

**United States District Court**
For the Northern District of California

1   Appellant also told his mother that he tried to pass the
    lie detector test by being "cool and calm" and putting
2   the shooting out of his mind.  The record simply does not
    support appellant's claim that the polygraph test broke
3   his will.

4   Nor did the police use appellant's mother as a coercive
    "instrument for confession extraction," as appellant
5   claims.  The record is undisputed that appellant's mother
    initiated contact with the police, and then freely
6   accepted Sergeant Celestre's offer to let her speak with
    her son before he was booked.  The police did not
7   instruct the mother how to act or converse with
    appellant; they simply gave her the option of seeing her
8   son.  We recognize that the police hoped that appellant
    would confess to his mother, and monitored their
9   conversation for that purpose.  But this plan falls far
    short of the coercive use of a suspect's friends and
10  family condemned by the courts.

11  . . .

12  Finally, the record does not support appellant's claim
    that his confession was induced by police deception and
13  false promises of leniency.  Appellant asserts that
    Sergeant Celestre lied in telling him that the officer
14  had "somebody that is willing to testify that you shot
    that man."  However, Sergeant Celestre did have someone
15  who was willing – and did – identify appellant as the
    shooter.  Donald told the police that appellant shot
16  Saechao.  Any deception was limited to the officer's
    averment of the witness's willingness to testify, but the
17  officer said he believed that Donald could be brought to
    court as a witness, if necessary.  The officer's
18  overstatement of his case was slight, and there is no
    evidence that the embellishment induced appellant's
19  confession.

20  . . .

21  Lastly, appellant's claim of false promises of leniency
    is unsupported by the record.  Sergeant Celestre simply
22  told appellant that, if appellant was the gunman, he
    should say so now because it would be "worse" for the
23  fact to be revealed later.  The officer said: "And I'll
    tell you straight up, you know, I ain't going to sit here
24  [sic] bullshit you and tell you I'm going to wave some
    magic wand and make all your problems disappear.  But if
25  you're the one who pulled the trigger on dude, let's get
    it out on the table now. [¶] . . . [¶] Because if it --
26  if it comes out tomorrow or the day after that or next
    week, it's just going to make it that much worse."
27  Sergeant Celestre did not promise leniency; he exhorted
    honesty.  Police statements that "it would be better for
28  the accused to tell the truth" do not render a subsequent

12

confession involuntary. (<u>People v. Boyde</u> (1988) 46 Cal. 3d 212, 238.) Appellant clearly did not confess with any expectation of leniency. Appellant told his mother that he would "probably do 25 years," and never suggested that he was expecting that his confession would bring a lighter sentence.

Pet.'s Ex. A at 4-11.

B. Applicable Federal Law

1. <u>Miranda</u>

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given if a suspect's statement made during custodial interrogation is to be admitted in evidence. Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently. <u>Id.</u> at 475. Voluntary means that the waiver was the product of free and deliberate choice rather than intimidation, coercion or deception. <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987). Knowing and intelligent means that the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u>; <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

A valid waiver of <u>Miranda</u> rights depends upon the totality of the circumstances, including the background, experience and conduct of the defendant. <u>United States v. Bernard S.</u>, 795 F.2d 749, 751 (9th Cir. 1986). In the case of juveniles, this includes evaluation of the juvenile's age, experience, education, background and intelligence, and whether the juvenile has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights and the consequences of waiving those rights. <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979).

Where a <u>Miranda</u> waiver is concerned, the voluntariness prong

and the knowing-and-intelligent prong are two separate inquiries; a state court's finding that a <u>Miranda</u> waiver was knowing and intelligent is a question of fact. <u>Derrick v. Peterson</u>, 924 F.2d 813, 820-24 (9th Cir. 1990), <u>cert. denied</u>, 502 U.S. 853 (1991). Whether a waiver was made voluntarily presents a mixed question of law and fact. <u>Id.</u> at 821-22; <u>Miller v. Fenton</u>, 474 U.S. at 116.

    2. Due Process

    Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment. <u>Blackburn v. Alabama</u>, 361 U.S. 199, 207 (1960). The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect. <u>Miller v. Fenton</u>, 474 U.S. 104, 116 (1985); <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986) (coercive police activity is a necessary predicate to the finding that a confession is not voluntary).

    "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226-27 (1973); <u>see e.g.</u>, <u>Cunningham v. Perez</u>, 345 F.3d 802, 810-11 (9th Cir. 2003) (officer did not undermine plaintiff's free will where interrogation lasted for eight hours and officer did not refuse to give break for food and water, officer suggested cooperation could lead to treatment rather than prison, officer made statement he had put people in prison for similar conduct, officer denied plaintiff's request to call therapist, and plaintiff diagnosed with mental disorder and taking bi-polar medication); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1073 (9th Cir.), <u>cert. denied</u>, 540

U.S. 968 (2003) (holding that state court's determination that interrogation was non-coercive, where suspect was interrogated over five-hour period in six by eight foot room without water or toilet, was objectively reasonable application of <u>Schneckloth</u>).

The suspect's age may be taken into account in determining whether a confession was voluntary. <u>Taylor v. Maddox</u>, 366 F.3d 992, 1015-16 (9th Cir. 2004) (finding confession involuntary where petitioner, a sixteen-year-old, was interrogated for three hours in the middle of the night without an attorney or parent, given no food, offered no rest break, may or may not have been given water, threatened by officer's jabbing ring in his face and drawing diagram of a grim future if he did not confess, and denied access to telephone to contact attorney). However, it is not enough, even in the case of a juvenile, that the police indicate that a cooperative attitude would be to the benefit of an accused unless such remarks rise to the level of being threatening or coercive. <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1273 (9th Cir. 2005) (quoting <u>Fare</u>, 442 U.S. at 727).

C. Analysis

    1. <u>Miranda</u> Claim

Petitioner claims his <u>Miranda</u> waiver was not voluntary, intelligent or knowing because he was sixteen years old at the time of the interrogation, is borderline retarded, has severe learning problems, and suffers severe deficits in basic skills which cause him to function on the level of an eight to ten year old child.

The record is devoid of any evidence that the police used coercive, intimidating or deceptive tactics to motivate Petitioner to waive his <u>Miranda</u> rights. Petitioner's arguments focus on his

mental and intellectual deficiencies and resulting alleged inability to understand the significance of the waiver, not on any improper police tactics.  The Court concludes that the state court's decision was not contrary to or an unreasonable application of established federal law.

In analyzing the intelligent-and-knowing prong of the <u>Miranda</u> claim, the state court considered <u>Miranda v. Arizona</u> and <u>Fare v. Michael C.</u>, the two Supreme Court cases directly on point. Therefore, the state court opinion was not contrary to established federal law.

<u>Fare</u> held that the same totality-of-circumstances approach applies whether the suspect is a juvenile or adult.  442 U.S. at 725-26.  Addressing the interrogation of a sixteen-year old, the Court noted:

> The transcript of the interrogation reveals that the police officers conducting the interrogation took care to ensure that respondent understood his rights.  They fully explained to respondent that he was being questioned in connection with a murder.  They then informed him of all the rights delineated in <u>Miranda</u>, and ascertained that respondent understood those rights.  There is no indication in the record that respondent failed to understand what the officers told him. . . . [¶] Further, no special factors indicate that respondent was unable to understand the nature of his actions.  He was a 16 1/2-year-old juvenile with considerable experience with the police.  He had a record of several arrests.  He had served time in a youth camp, and he had been on probation for several years. . . .  There is no indication that he was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be.  He was not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit.
>
> On these facts, we think it clear that respondent voluntarily and knowingly waived his Fifth Amendment rights.

<u>Id.</u> at 726-27.

Here, the state appellate court looked at the totality of the

16

**United States District Court**
For the Northern District of California

circumstances regarding Petitioner's <u>Miranda</u> waiver and concluded that nothing at the time of the waiver or during the interrogation suggested that Petitioner did not understand the nature of the rights he waived or the consequences of the waiver.  The court's analysis shows that it took into consideration Petitioner's age and experience with the police in making its determination.  Petitioner is correct that the court did not mention the fact that he had a low IQ and learning disabilities.  However, the record shows that, even though Petitioner was far below his age level in reading and writing, his memory and ability to understand cause and effect were good.  <u>See</u> RT at 700, 724.  It was reasonable to conclude that the skills Petitioner possessed allowed him to understand the nature of the rights he was waiving and the consequences of his waiver.  Thus, the appellate court's denial of this claim was not an unreasonable application of federal law nor an unreasonable finding of facts based upon the evidence in the record.  Habeas relief based on the <u>Miranda</u> claim is denied.

2. Due Process Claim

Petitioner claims that, based upon his particular characteristics and the details of the interrogation, his confession was involuntary and thus, his due process rights to a fair trial were violated by its admission into evidence at trial.

a. Petitioner's Characteristics

Citing <u>Haley v. Ohio</u>, 332 U.S. 596, 599-600 (1948), Petitioner claims his youth was a significant factor in evaluating whether his confession was voluntary.  In <u>Haley</u>, the police took a fifteen-year old boy from his home to police headquarters at midnight to question him about his involvement in a murder.  <u>Id.</u> at 598.  He

17

**United States District Court**
For the Northern District of California

was questioned for five hours by at least five police officers who interrogated him in relays of two or more at a time.  Id.  Only after the suspect confessed at about 5 a.m. did the police inform him that he had the right to remain silent and the right to an attorney.  Id.  The Supreme Court concluded that the suspect's due process rights had been violated.  Id. at 600.  But, in addition to the suspect's age, the Court based its conclusion on the facts that he was not advised of his Fifth Amendment rights before the interrogation began, and that he was questioned in the middle of the night, non-stop, by a combination of five different officers.  Id.  Noting that the police prevented the suspect from seeing his attorney for three days and his mother for five days after his confession, it found that the "callous attitude of the police towards the safeguards which respect for ordinary standards of human relationships compels that we take with a grain of salt their present apologia that the five-hour grilling of this boy was conducted in a fair and dispassionate manner."  Id.

Although Petitioner was sixteen at the time of the police interrogation, other circumstances the Court relied on in Haley were absent here.  Most importantly, Petitioner was given his Miranda warning before the interrogation began and he had experience with the police and police interrogations.  Unlike the interrogation in Haley, Petitioner's interrogation was videotaped and, thus, the actions of the officers were visible to judicial scrutiny.  Finally, Petitioner was not kept isolated from his mother for days after the interrogation.  Therefore, the appellate court did not unreasonably apply Supreme Court authority by arriving at a different result than the Haley Court.

**United States District Court**
For the Northern District of California

Citing four Supreme Court cases, Petitioner argues that his lack of intelligence and education were important factors that the appellate court did not consider.  As noted above, Petitioner is correct that the appellate court did not specifically mention his mental ability in its opinion.  However, although the cases cited by Petitioner involved suspects who were mentally deficient, they also involved other circumstances which established police coercion.  In <u>Fikes v. Alabama</u>, 352 U.S. 191, 193, 196 (1957), the suspect was uneducated and of low mentality, but also mentally ill and highly suggestible.  He was kept in isolation for one week, except for sessions of questioning.  <u>Id.</u> at 197.  His father and lawyer were barred in attempts to see him.  <u>Id.</u>  He was not taken before a magistrate after his arrest as is required by Alabama law.  <u>Id.</u> at 194.

In <u>Payne v. Arkansas</u>, 356 U.S. 560, 567 (1958), in addition to being mentally slow, the petitioner was arrested without a warrant, was denied a State-required hearing before a magistrate at which he would have been advised of his right to remain silent and his right to counsel, was not advised of his right to remain silent or his right to counsel, was held incommunicado for three days while members of his family were turned away, was refused permission to make even one telephone call, was denied food for long periods, and was put in fear for his life by the chief of police who told him that there would be thirty to forty people at the police station who wanted to get him.  The Court concluded that the fact that the petitioner confessed after being exposed to the threat of mob violence established that the confession was coerced.  <u>Id.</u>

In <u>Spano v. New York</u>, 360 U.S. 315, 322 (1959), the petitioner

19

was a foreign-born, twenty-five year old man with only one-half
year of high school education and a history of emotional
instability.  He was subjected to questioning by at least fourteen
law enforcement officials for eight hours during the night before
he confessed.  Id.  His repeated requests for his attorney, whom he
had retained, were ignored.  Id. 322-23.  Finally, the police
instructed Bruno, a fledgling police officer and the petitioner's
childhood friend, to tell the petitioner untruthfully that, because
the petitioner had called Bruno before he had turned himself over
to the police, Bruno might lose his job, which would be disastrous
for his pregnant wife, three children and unborn child.  Id. at
319.  The petitioner confessed after the fourth time Bruno told him
this untruth.  Id.  The Court concluded that the petitioner's will
was overborne by "official pressure, fatigue and sympathy falsely
aroused" by Bruno's story.  Id. at 323.

     In Columbe v. Connecticut, 367 U.S. 568, 620 (1961), the
petitioner had an IQ of sixty-four and as a result was classified
as a "high moron."  He was suggestible and could be easily
intimidated.  Id. at 621.  In addition, he was in police custody
for approximately five days before he confessed; he was never
advised of his Fifth Amendment rights; he was confronted by his
wife, whom police had coached to ask him to tell the truth; his
thirteen-year old daughter was called upon in his presence to
recount incriminating circumstances; his requests for a lawyer were
ignored; and, instead of promptly being brought in front of a
magistrate as required by Connecticut law, he was taken to a police
court on a "palpable ruse of a breach-of-the-peace charge concocted
to give the police time to pursue their investigation."  Id. at

United States District Court
For the Northern District of California

627-31.

In each case, although the petitioner was mentally impaired, there were many other circumstances establishing police coercion. Therefore, the Court addresses whether the record here demonstrates such coercion by the police.

              b. Coercive Police Activity

                    1. Physical Circumstances of Interrogation

Citing Spano, 360 U.S. at 322 and Ashcraft v. Tennessee, 322 U.S. 143, 153, (1944), Petitioner contends that the length, continuity, location and circumstances of his interrogation help to establish that his confession was coerced.  These cases are distinguishable.

As discussed above, in Spano, the suspect was questioned for many hours by relays of officers while he was held incommunicado and the police enlisted the cooperation of the suspect's friend who persuaded him to confess.

In Ashcraft, relays of officers, experienced investigators, and highly trained lawyers questioned the suspect for thirty-six hours during which time he was held incommunicado and was not allowed to sleep or rest.  322 U.S. at 153.  In both Ashcraft and Spano, the interrogations were not videotaped.  Id. at 149; Spano, 360 U.S. at 325 (dissent).

In contrast, Petitioner was questioned by only three law enforcement officials and the interrogation was videotaped and viewed by the trial court and the appellate court.  The courts found no signs of police aggression and no signs that Petitioner was afraid, confused or fatigued during the course of the interrogation.  Therefore, the circumstances of Petitioner's

interrogation did not create the coercive atmosphere that the Court found objectionable in <u>Spano</u> and <u>Ashcraft</u>.

### 2. Psychological Coercion

Petitioner contends that the police used psychological techniques that were condemned in <u>Miranda</u>.  Although Petitioner is correct that <u>Miranda</u> cited several interrogation techniques that were developed for the purpose of obtaining a confession from a suspect, it did not suggest that use of these techniques constituted a violation of due process; it listed these techniques to explain why, before a custodial interrogation began, it was necessary for a suspect to be advised of his Fifth Amendment rights to be silent and to be represented by an attorney.  <u>Miranda</u>, 384 U.S. at 449-456.  Petitioner cites no federal authority for the proposition that the psychological techniques used by the police during his interrogation are unconstitutional.  Therefore, this claim is without merit.

### 3. Polygraph Test

As noted above, Petitioner contends that the officers' use of the polygraph test was coercive because the operator told him that the test could detect lies and that Petitioner had failed. Petitioner relies on a federal case from the District of New Jersey and a state case from New York.  These do not meet the AEDPA requirement for establishing an unreasonable application of Supreme Court authority.

Petitioner faults the officers for explaining to him how the test operated and for showing him how the test indicated he was being untruthful, but doesn't explain how this was coercive.  The appellate court's conclusion that the polygraph test was not

coercive was not contrary to or an unreasonable application of federal law.

### 4. Use of Petitioner's Mother

Petitioner claims that the police used his mother as an unwitting agent for coercing a confession from him.  The cases Petitioner cites for this argument, Spano 360 U.S. at 323 and Culombe, 367 U.S. at 630 are distinguishable.  As noted above, in Spano, the police asked the suspect's childhood friend to extract a confession from him by lying to him.  Spano, 360 U.S. at 323.  In Culombe, the suspect's wife was asked to tell her husband to confess and his thirteen-year old daughter was called upon in his presence to recount incriminating circumstances.  Culombe, 367 U.S. at 630.

Here, the police did not instruct the mother in what to say. Petitioner confessed to his mother almost immediately after she entered the room.  Under these circumstances, the fact that the police allowed Petitioner to see his mother cannot be construed as using the mother to coerce a confession from Petitioner.

### 5. Police Deception, Threats and Promises of Leniency

Again citing Spano, 360 U.S. at 321-24, Petitioner claims that the officers' lies, threats and promises of leniency rendered his confession involuntary.  However, even the evidence Petitioner cites shows that Officer Celestre was urging Petitioner to tell the truth, not offering him leniency or making threats.

In sum, the appellate court's decision that Petitioner's confession was not coerced was not contrary to or an unreasonable application of established federal authority and habeas relief is

1   denied on this ground.

2   III. <u>Brady</u> Claim

3        Petitioner claims that, prior to trial, the prosecution failed

4   to disclose to the defense exculpatory and material evidence of a

5   statement by Phillip Kendrick to San Pablo Police Department

6   Detective Mark Harrison that Petitioner did not shoot Saechao, but

7   that other individuals were responsible.

8        A. Superior Court Habeas Opinion

9        The superior court judge who had presided over Petitioner's

10  trial considered his habeas petition.  He held an evidentiary

11  hearing on the <u>Brady</u> claim and concluded that Kendrick's statements

12  to the police constituted favorable exculpatory evidence that

13  should have been disclosed to the defense.  However, the court

14  denied the <u>Brady</u> claim on the ground that there was not a

15  reasonable probability that, had the statements been disclosed, the

16  result of the proceeding would have been different.  Petitioner's

17  Ex. C, <u>In re Clyde James Rainey, on Habeas Corpus</u>, No. 01442-2,

18  March 23, 2005 at 12, 14.

19            1. State Court's Finding of Facts

20       The habeas court noted that the defense theory at trial had

21  been that, although Petitioner did shoot Saechao, it was not a

22  special circumstances robbery-murder because Saechao's wallet had

23  not been taken.  Instead, the defense argued that the killing was

24  part of a gang initiation of a young man who wanted the respect and

25  status of membership.  The jury did not believe Petitioner's

26  defense and convicted him of the special circumstance murder during

27  the course of a robbery.  Ex. C. at 11.

28       The court found that Detective Harrison was a qualified expert

United States District Court
For the Northern District of California

in the area of gang identification and criminal street activity, particularly in the area of North Richmond where the shooting of Saechao occurred. Detective Harrison testified that the dominant street gangs in this area were the Project Trojans (PJTs) and their subset, Trojans in Training (TITs). Both gangs engaged in street level sales of drugs and witnesses who testified against them had been murdered. If the gangs were unable to murder the alleged snitch, they chose a close relative. Detective Harrison knew many of the individuals in these gangs, including those individuals mentioned to him by Kendrick. At the time of his interview with Kendrick, Detective Harrison knew that Petitioner and Donald Clark were suspects in the shooting of Saechao. Ex. C at 3.

On July 21, 1997, Detective Harrison conducted a lengthy interview with Kendrick regarding three murders he was suspected of committing. Kendrick was in the core group of PJTs. Detective Harrison asked Kendrick about Petitioner, who was not a gang member. Kendrick stated that he knew Petitioner and that he was present on the night that Saechao was murdered. He stated that an Asian man tried to buy marijuana from an individual named Butter. When the man paid for the marijuana, other people nearby saw that he had a great deal of cash on him and tried to rob him. The following colloquy took place between Detective Harrison and Kendrick:

> H: Now does Clyde do it or did Brian?
>
> K: Brian D. and Donald shot him 'cause Brian D. shot him one time in the back and from the back now, from the back . . . I seen Brian D. shoot one time from the back and I seen Donald shoot one time from the side.
>
> H: Now you're talking about Clyde?

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1
2

> K: Yeah, but I call him Donald though, and I seen them
> set him over, 'cause when they shot, all the blood flew
> in Butter face and shit.

3  Ex. C. at 3-4.

4       At the evidentiary hearing before the state habeas court,

5  Kendrick testified that on October 31, 1996, he was hanging out on

6  Sixth and Grove in North Richmond.  Also present were Donald Clark,

7  Brian Williams (also known as Brian D.), Hassan Williams (also

8  known as Dust) and Petitioner.  Donald Clark was waving a gun.

9  Butter was not there.  A car drove up, and an Asian man got out who

10  wanted to buy marijuana.  Donald Clark was about to sell him some,

11  when Dust, Kendrick and Petitioner walked away.  Kendrick turned

12  around and saw Donald Clark, holding his gun in his hand, standing

13  over the Asian man.  The Asian man was lying in the street and

14  Kendrick observed Donald Clark shoot him a second time.  He never

15  saw Brian Williams shoot the Asian man; Brian Williams was just

16  standing next to Donald Clark.

17       Kendrick continued that, on June 21, 1997, he had turned

18  himself in to the Richmond police on other matters.  He was

19  interviewed by Detective Harrison.  Kendrick recalled that

20  Detective Harrison asked him about Petitioner's involvement in a

21  shooting and that Kendrick had told him that Brian D. and Donald

22  Clark did the shooting.  Kendrick also testified that he had talked

23  to defense counsel's investigator in January, 2001 and had said

24  that the shooting occurred on Fifth Street and that the Asian man

25  drove up in a cab.  Kendrick testified that he had been wrong about

26  the shooting occurring on Fifth Street and about the Asian man

27  driving up in a cab.

28       On cross-examination by the prosecutor, Kendrick was asked why

26

United States District Court

For the Northern District of California

he had told Detective Harrison in the June 21, 1997 interview that Brian D. as well as Donald Clark shot Saechao.  Kendrick replied: "When Donald shot him, Brian D. was standing next to him, so I was trying to say, you know what I'm saying, that Brian D. was right next to him . . ."  Kendrick also said that Detective Harrison was asking him many questions and it had been going on for hours, so that he was telling Detective Harrison what he wanted to hear. Kendrick admitted that he did not know where the first shot hit Saechao and that his statement that blood flew in Butter's face was untrue.  Kendrick admitted that parts of his statement to Detective Harrison were made up.

With respect to the question, "You mean Clyde?" and his answer, "Yeah, but I call him Donald though," Kendrick testified, "I was trying to tell him that I said Donald, the one who did the shooting, not Clyde, and it came out the wrong way."

Kendrick also admitted that he had lied about several things he told the defense investigator on January 17, 2001 and that he was "mixing the truth with the false" because he did not trust the investigator.  Ex. C at 6-8.

At the evidentiary hearing, Elizabeth Harrigan, Petitioner's trial attorney, testified that she did not receive a copy of Detective Harrison's interview with Kendrick until years after Petitioner's trial.  Harrigan testified that if she had this evidence, her defense would have been that Donald Clark was the shooter and that Petitioner's confession was false, made to protect himself from retaliation by the gang or out of loyalty to the gang. Harrigan surmised that if Petitioner testified against the PJT gang and was labeled a snitch, not only would his life be in danger, but

27

**United States District Court**
For the Northern District of California

his whole family would potentially be in danger.  Harrigan thought

that because Petitioner was young, inexperienced and not too

intelligent, he would "take one for the gang."  Harrigan did not

find the inconsistencies in Kendrick's statements to be

insurmountable.  Harrigan also testified that she would have used

Kendrick as a witness at trial even though he was a convicted

felon, a murderer and gave different versions of what happened,

including admitted lies.

Ex. C. at 8-10.

2. State Court's Analysis

As noted above, the court concluded that Kendrick's statement

was exculpatory, that it was suppressed by the prosecution, but

that it was not material under Brady.  The court emphasized that

Kendrick had given three different versions of the shooting to law

enforcement officials.  First, he had told Detective Harrison that

Butter sold marijuana to Saecho and that Brian D and Donald Clark

shot Saechao.  In a January, 2001 declaration attached to the

habeas petition, Kendrick testified that Donald Clark fired one

shot at the victim and that Kendrick did not know who fired the

second shot.  At the evidentiary hearing, Kendrick testified that

he saw Donald Clark shoot the victim twice.

The court stated:

> Kendrick's veracity . . . troubles the court . . .
> Kendrick admitted at the OSC hearing[2] that Butter was not
> at the scene and that he made up that story.  At the OSC
> hearing he admitted he lied to Harrison and told Harrison
> what Harrison wanted to hear.  He lied about the cab
> incident; he lied to counsel's investigator.  He
> purposefully mixed "the truth with the false."  The
> pattern is consistent, whether it be Harrison or

[2]The evidentiary hearing.

28

counsel's investigator; Kendrick in his own words was "mixing some of the truth with the false."

Kendrick's attempts to extricate himself from his lies are completely unconvincing.  For example saying he calls Clyde "Donald" when he later testified that no one, including himself, calls Clyde "Donald."  Then there is the example of saying Brian D shot the victim when he meant to say Brian D was standing next to the victim.  His testimony just does not stack up.

The results of Kendrick's handiwork are the inconsistent Statements set forth above.  The court knows of no method by which the various Statements can be reconciled and the ultimate true version of the facts gleaned therefrom.  It is for this reason, inter alia, that the court now finds that all the Kendrick Statements, including the Stipulation, set forth above are not trustworthy and completely lack any indicia of reliability.  The court accepts petitioner's version of the facts as set forth in his confession.  Moreover, the court had an opportunity to observe Kendrick's demeanor at the OSC hearing and now finds his testimony to be wholly wanting.

The court appreciates that defense counsel would have executed a different trial strategy if she had the 1997 Kendrick statement.  That strategy would have included using Kendrick as a witness.  And that's the rub: how many versions of the shooting would he have concocted by the time he testified.  The court cannot say.  But if he mixed the truth with the false, as is his custom and habit, the jury, following cross-examination of him, would have found that they had to face the same question the court just faced, namely what value, if any, to place in Kendrick's testimony knowing that he was a liar.

The jury's answer to that question, however, is not a difficult one.  The jury would have placed no value at all in his testimony.  Jurors take their jobs very seriously and when they turn their intellects individually and collectively to Kendrick's testimony, they will see it for what it is, to wit, some strange contrived ramblings of a convicted gangster.  Moreover, that jury would have petitioner's straightforward and plausible confession as a counterweight to Kendrick's concoctions.  Admittedly trial counsel would attempt to prove the confession was a false confession, but that strategy would be unavailing because petitioner was neither in the PJTs nor the TITs and therefore, had no reason to take one for the gang.  In short, it would be extremely unlikely a jury would have been convinced of the claim that the confession was a false confession when they had petitioner's voluntary confession to his mother and the videotaped confession to Lt. Celestre.

> For all these reasons, the court now finds that there is
> not a reasonable probability that, had the evidence been
> disclosed to the defense, the result of the proceeding
> would have been different.

Ex. C at 12-14.

    B. Applicable Federal Law

    In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court

held that "the suppression by the prosecution of evidence favorable

to an accused upon request violates due process where the evidence

is material either to guilt or to punishment, irrespective of the

good faith or bad faith of the prosecution." Id. at 87.  Evidence

is material "if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the

proceeding would have been different.  A 'reasonable probability'

is a probability sufficient to undermine confidence in the

outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).

The Bagley standard of materiality "does not require demonstration

by a preponderance that disclosure of the suppressed evidence would

have resulted in the defendant's acquittal." Kyles v. Whitley, 514

U.S. 419, 434 (1995).  "A reasonable probability of a different

result is shown when the government's evidentiary suppression

'undermines confidence in the outcome of the trial.'" Id. (citing

Bagley, 473 U.S. at 678); United States v. Golb, 69 F.3d 1417, 1430

(9th Cir. 1995) (ultimate question is whether there is reasonable

probability that, had evidence been disclosed, result of proceeding

would have been different such that confidence in outcome is

undermined).

    A finding that the undisclosed evidence is material under

Bagley "necessarily entails the conclusion that the suppression

30

**United States District Court**
For the Northern District of California

must have had 'substantial and injurious effect or influence in
determining the jury's verdict'" under <u>Brecht</u>.  <u>Kyles</u>, 514 U.S. at
435.

C. Analysis

Petitioner argues that the state habeas court's conclusion
that Kendrick's testimony was not material was contrary to Supreme
Court authority because the court stated that there was "not a
reasonable probability that, had the evidence been disclosed to the
defense, the result of the proceeding would have been different."
Petitioner argues,

> The U.S. Supreme Court has repeatedly stated: To prove
> materiality, a defendant need not demonstrate that it is
> more likely than not that he would have received a
> different verdict with the evidence; rather, "[a]
> 'reasonable probability' of a different result is
> . . . shown when the government's evidentiary suppression
> 'undermines confidence in the outcome of the trial.'"
> <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995), quoting
> <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985).

Traverse at 33-34.

The state court used the standard in <u>Bagley</u> and <u>Kyles</u> did not
overturn or disapprove <u>Bagley</u>.  Rather, in <u>Kyles</u>, the Supreme Court
was providing further guidance for the "reasonable probability of a
different result" standard set forth in <u>Bagley</u> by distinguishing it
from a preponderance of the evidence standard.  <u>Kyles</u>, 514 U.S. at
434.  The Court further explained that the <u>Bagley</u> standard was met
when the government's suppression "undermines confidence in the
outcome of the trial."  <u>Id.</u> (citing <u>Bagley</u>, 473 U.S. at 678).
Therefore, the state court's opinion was not contrary to
established Supreme Court authority.

Petitioner argues that, with Kendrick as a witness, Harrigan
would have used the defense that Donald Clark, not Petitioner, was

31

the shooter, and that Petitioner falsely confessed to protect his mother from gang retaliation.  Petitioner argues that, without Kendrick's testimony, Harrigan's only choice was to present the weak defense that there were no special circumstances because Petitioner did not shoot the victim in the course of a robbery, but as a gang initiation.  Petitioner argues that, because he was denied the opportunity to present the stronger defense, he did not receive a fair trial.  However, Petitioner did not need Kendrick's testimony to use the defense that his own confession was false and that Petitioner did not shoot Saecho.

Further, there are flaws in Petitioner's argument that the jury would have believed that he confessed falsely to protect his mother.  First, the jury would have had to find that Kendrick was a credible witness, which the habeas court reasonably found was not probable.  The habeas court found, based on its own observations of Kendrick's demeanor during his testimony, that he was totally unreliable as a witness.  Had Kendrick testified at the trial, the jury would have observed the same demeanor that the court did. Furthermore, Kendrick's reason for lying, that he told Detective Harrison what "he wanted to hear," does not withstand scrutiny because there was no indication that the detective wanted to hear the version Kendrick told him.  Furthermore, there does not seem to be good reason for Kendrick's lies to the defense investigator, and Petitioner proffers no reason why Kendrick would have told Detective Harrison one story and the investigator another; the court's conclusion that Kendrick's custom and habit was to "mix the truth with the false" is the most plausible.

Second, the false confession explanation is implausible

because Petitioner could have maintained his original story that he wasn't at the scene of the crime and didn't know what happened. This version did not incriminate a gang member and thus would not have drawn retaliation.  Third, his statement to the police that gang member Donald Clark was the shooter contradicts the theory that he was afraid of gang retaliation.

Petitioner argues that the state court unreasonably relied on the fact that he "was neither in the PJTs nor the TITs and therefore had no reason to take one for the gang" by falsely confessing.  Petitioner points out that expert testimony at the evidentiary hearing and at trial demonstrates that whether an individual was a member of a gang was not relevant to whether that individual would falsely confess because a cooperating witness would have reason to fear a gang might harm a member of his family. However, as discussed above, the court relied on other findings to conclude that it was not reasonably probable that the jury would have found his confession to be false.

Petitioner also argues that, with Kendrick's testimony in evidence, Harrigan would have used Dr. Riley's testimony to show that Petitioner was very susceptible to fear and intimidation from the PJTs and that he could easily have been swayed to confess falsely to protect his mother, to whom he was very close.  However, Dr. Riley also testified that the personality tests she gave to Petitioner indicated that he scored a little above average in the category of independence as opposed to accommodating, that he scored a little above average in the category of dominance, that he scored at the top of the average range in the category of vigilance as opposed to trusting, that he scored just over the average range

United States District Court

For the Northern District of California

1   for self-controlled as opposed to unrestrained, and he scored a

2   little above average in the category of rule-conscious as opposed

3   to expedient.  RT at 715-718.  With these personality

4   characteristics, it would not have been evident that Petitioner was

5   particularly susceptible to fear and intimidation.

6       Based on the above, the state court was reasonable in finding

7   that Kendrick's statement to the police was not material.  Thus,

8   the court's decision was not contrary to or an unreasonable

9   application of established federal authority nor was it based on an

10  unreasonable determination of the facts in light of the evidence in

11  the record.

CONCLUSION

13      Based on the foregoing, the petition for writ of habeas corpus

14  is DENIED.

16      IT IS SO ORDERED.

18  Dated: 9/2/08                    _____
19                                   CLAUDIA WILKEN
                                     United States District Judge

34